United States District Court
Southern District of Texas
**ENTERED**
July 05, 2019
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHARON D. NICHOLS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-2278 |
| | § | |
| ANDREW SAUL, COMMISSIONER | § | |
| OF THE SOCIAL SECURITY | § | |
| ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION**

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 13) and Defendant's Cross-Motion for Summary Judgment (Doc. 12). The court has considered the motions, Defendant's response, Plaintiff's reply, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance benefits ("DIB") under Title II and for

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 3, Ord. Dated July 13, 2018.

supplemental security income ("SSI") under Title XVI of the Social Security Act ("the Act").

**A.  <u>Medical History</u>**

Plaintiff's medical history, or lack thereof, generally illustrates greater support for Plaintiff's physical/spinal impairments than her alleged mental health impairments. While there is a consultative mental status exam in the record, there is little additional evidence of diagnosed mental health impairments or treatment. In fact, records resulting from appointments unrelated to mental health often included reference to mental health diagnoses without performing an additional evaluation.

**1.  Physical Impairments**

On March 30, 2015, Plaintiff visited Midtown Houston Open MRI & X-Ray for cervical and lumbar magnetic resonance imaging ("MRI").[2] The cervical MRI produced no evidence of acute fracture and unremarkable results, except for the following:

> C4-C5: Broad-based 3 mm central disc protrusion indents the ventral cervical cord. The intervertebral disc demonstrates decreased central hyperintensity with preservation of the disc height, suggesting an acute injury with leakage of central disc contents. Moderate central canal stenosis, 8 mm AP. Associated mild bilateral neural forminal stenosis.
>
> C5-C6: Grade 1 (3 mm) retrolisthesis with uncovering of the intervertebral disc and broad-based 4 mm central/left central disc protrusion. Disc protrusion indents the ventral cervical cord. The intervertebral disc demonstrates decreased central hyperintensity with

---

[2]    <u>See</u> <u>Tr.</u> 420-24.

preservation of the disc height, suggesting an acute injury with leakage of central disc contents. Moderate central canal stenosis, 8 mm AP. Associated mild bilateral neural foraminal stenosis.[3]

Plaintiff's lumbar MRI also found no evidence of acute fracture and noted that the conus medullaris and nerve roots were normal.[4] The lumbar MRI revealed unremarkable results except for the following:

L5-S1: Broad-based 2 mm central disc protrusion indents the thecal sac. The intervertebral disc demonstrates decreased central hyperintensity with preservation of the disc height, suggesting an acute injury with leakage of central disc contents. Associated mild right/moderate left neural foraminal stenosis. Canal is patent.

L4-L5: Broad-based 6 mm central disc protrusion with a superimposed 5 mm posterior left central annular fissure (high intensity zone) mildly contacts bilateral L5 nerve roots in the lateral racasses with associated severe canal stenosis, 7.4 mm AP. The intevertebral disc demonstrates decreased central hyperintensity with preservation of the disc height, suggesting an acute injury with leakage of central disc contents. Associated moderate bilateral neural foraminal stenosis.

L3-L4: Broad-based 2 mm central disc protrusion indents the thecal sac. The intervertebral disc demonstrates decreased central hyperintensity with preservation of the disc height, suggesting an acute injury with leakage of central disc contents. Neural foramina are patent. Canal is patent.[5]

On April 22, 2015, and May 8, 2015, Plaintiff visited Interventional Spine of Texas for treatment and a follow-up

---

[3]    See Tr. 421.

[4]    See id.

[5]    See Tr. 423.

appointment.[6]  On April 22, she received transforaminal epidural steroid injections on her right L4-5 and right L5-S1.[7]  She had pre- and post-procedure diagnoses of lumbar radiculopathy and a lumbar herniated disc.[8] At the May 8 follow-up, Plaintiff reported a sixty-percent improvement in lower back pain and less intense and less frequent symptoms of sharp shooting pain in her right leg.[9] The progress notes also stated that symptoms of neck pain and sharp shooting pain to the right arm were managed conservatively and that Plaintiff occasionally took analgesics for pain relief.[10]

On May 3, 2015, Plaintiff visited the emergency department at Memorial Herman Hospital complaining of chest pain with pain radiating down her right arm.[11]  On May 9, 2015, Plaintiff returned complaining of breast pain.[12]  At both visits, the physical examinations showed normal results for Plaintiff's neck, back, mood/affect, speech, and cranial nerves.[13]

On July 20, 2015, Plaintiff returned to Interventional Spine of Texas for re-evaluation of symptoms and complained of continued

---

[6]     See Tr. 415-22.

[7]     See Tr. 419.

[8]     See id.

[9]     See id.

[10]    See id.

[11]    See Tr. 499-519.

[12]    See Tr. 520-28.

[13]    See Tr. 499-528.

neck pain and lower back pain.[14]   The progress notes stated
Plaintiff "[r]eports no additional relief of neck pain and LBP
["lower back pain"] with sharp, shooting pain to the right arm and
right leg. ADL ["activities of daily living"] [are] still limited.
Patient still depends on analgesics for pain relief."[15]   The
psychological examination revealed Plaintiff was alert and oriented
and was able to demonstrate good judgment and reason without
abnormal affect or behaviors.[16]   The musculoskeletal and neurologic
examination revealed residual tenderness, residual weakness of
right arm and leg strength, and diminished right bicep, tricep, and
patellar reflex.[17]   Plaintiff also reported various pain levels
between five and eight out of ten.[18]   The plan of treatment
recommended "conservative management" of Plaintiff's ailments,
including epidural steroid injections and physical therapy or
chiropractic appointments.[19]

In December 2015, Plaintiff received a physical/orthopedic
consultative examination by Daryl Daniel, M.D., ("Dr. Daniel").[20]
The physical examination yielded normal results for nearly all

---

[14]   See Tr. 539.

[15]   See id.

[16]   See id.

[17]   See id.

[18]   See id.

[19]   See Tr. 540-41.

[20]   See Tr. 435-40.

systems.[21]   The musculoskeletal section noted "[n]o muscle atrophy
or bone enlargement . . . [n]o crepitans, bony or tissue
destruction, joint instability, redness, swelling or effusion."[22]
The neurological section noted the following:

> Cranial nerves II through XII, and deep tendon reflexes
> are grossly normal.  Sensory examination is noted to be
> adequate in the upper and lower extremities.  Gait is
> normal with no problems standing from a sitting to a
> standing position.  Hand grip/strength is 5/5 on the
> right and 5/5 on the left.  In the major muscle groups,
> upper extremity strength is 5/5 on the right and 5/5 on
> the left.  Lower extremity strength is at 4/5 on the
> right and /5 [sic] on the left with knee raises and leg
> extensions.  Straight leg raises are positive at eighty
> degrees on the right and eighty on the left, while in the
> supine position. [Plaintiff] can effectively bend over
> seventy-five degrees with an attempt to touch toes.
> [Plaintiff] can walk on toes and heels, and is not able
> to squat today with support of exam table in the room.[23]

Finally, the clinical impression section included cervicalgia and
lumbalgia with radiculopathy and chronic pain.[24]

## 2.  Mental Impairments

In July 2015, Plaintiff underwent a mental status consultative
examination performed by Trista Huckleberry, Ph.D., ("Dr.
Huckleberry").[25]  During the examination, Plaintiff's responses were
slow but appropriate, and she was able to process questions and

---

[21]     See Tr. 440.

[22]     See id.

[23]     See id.

[24]     See id.

[25]     See Tr. 430-34.

offer related responses.[26]    According to the notes, Plaintiff demonstrated a primarily flat affect but was highly emotional in a few of her responses.[27]    Plaintiff was diagnosed with "Major Depressive Disorder, severe, recurrent, with anxious distress."[28] Her prognosis was guarded, Dr. Huckleberry opined, and Plaintiff's ability to improve her health was negatively impacted by her depression.[29]    Finally, Dr. Huckleberry reported the following regarding Plaintiff's functional capacity:

> [Plaintiff] has the ability to understand, carry-out and remember instructions for simple one-two step instructions, and some complex instructions.  She is limited in her ability to process and retain information, mainly impacted by depression and poor memory.  The claimant reports ongoing physical pain, which would be a deterrent to sustained concentration and persistence in a work-related activity.  The claimant is anxious and has poor social skills.[30]

## B.  Administrative Process

Plaintiff applied for Social Security DIB and SSI on May 18, 2015.[31]  She alleged that her disabling condition began on February 9, 2015, and was a result of a car accident on February 9, 2015.[32]

---

[26]    See Tr. 433.

[27]    See id.

[28]    See id.

[29]    See Tr. 434.

[30]    See id.

[31]    See Tr. 227-240.

[32]    See Tr. 227-228.

Plaintiff explained that the accident caused problems with her neck and back and required her to stop working on March 23, 2015.[33]

In Plaintiff's function report, she stated she had trouble seeing, standing, and remembering.[34]  She also stated she had back pain when bending or lifting and that her leg "g[a]ve out" on her.[35] She stated she was unable to sleep well as a result of her back and leg pain, as well as sadness and depression.[36]  She also reported needing assistance with dressing, washing her back, and combing her hair, but was able to feed herself and use the toilet without difficulty.[37]  She stated she was unable to do any work around the house because of her difficulties standing and walking, but she was able to drive, shop, and manage her finances.[38]  She reported reading the Bible and watching television every day and going to church, doctor's appointments, and the grocery store on a regular basis.[39]

Plaintiff stated her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, complete tasks, concentrate, remember, understand, and

---

[33]   See id.

[34]   See Tr. 298.

[35]   See id.

[36]   See Tr. 299.

[37]   See id.

[38]   See Tr. 301.

[39]   See Tr. 302.

follow instructions.[40]   Plaintiff stated she could walk to the street and could stand about fifteen minutes before needing to rest.[41]   She stated she could not concentrate or remember well but could get along with others.[42]   Plaintiff also stated that she was always afraid of people trying to hurt her but that her behavior was good.[43]   Plaintiff finally noted that she used glasses every day and needed eye surgery.[44]

In Plaintiff's work history report, she stated she worked for Sam's Club in 2000 as a cashier, cleaner, and stocker.[45]   However, she injured her back after picking up a fifty-pound bag of dog food and was not able to work for one year.[46]   From 2001-2003, she worked for Texas A&M University in food service and for Kroger as a cashier, cleaner, and stocker.[47]   From 2004-2010, she worked for Denny's as a cashier, cleaner, and waitress.[48]   From 2010-2012, she worked for Dillard's as a cashier, cleaner, and stocker.[49]   From

---

[40]   See Tr. 303.

[41]   See id.

[42]   See Tr. 304.

[43]   See id.

[44]   See id.

[45]   See Tr. 317.

[46]   See id.

[47]   See id.

[48]   See id.

[49]   See id.

2012-2015, she worked for Memorial Hermann Hospital and Ben Taub Hospital in food service.[50]

On September 10, 2015, the SSA found Plaintiff not disabled at the initial level of review for both DIB and SSI.[51]  After Plaintiff requested reconsideration on November 5, 2015, the SSA again found Plaintiff not disabled on January 11, 2017.[52]  At both levels of review, the medical experts considered whether Plaintiff's condition met or equaled the requirements of any medical listing for presumptive disability ("Listings"),[53] specifically addressing Listing 1.04 (disorders of the spine) and Listing 12.04 (affective disorders).[54]  The record stated that the medical experts found Plaintiff to be only partially credible and that her alleged limitations were not wholly supported by the evidence.[55]  The medical experts found Plaintiff's ADLs, medication treatment, and the location, duration, frequency, and intensity of symptoms to be most informative of her credibility.[56]

**C.  Hearing**

---

[50]     See Tr. 318.

[51]     See Tr. 157-64.

[52]     See Tr. 165, 168-71.

[53]     "The Listings" refers to medical impairments that automatically qualify a claimant for disability benefits as listed in Appendix 1 of the regulations.  20 C.F.R Pt. 404, Subpt. P, App. 1.

[54]     See Tr. 93-154.

[55]     See id.

[56]     See id.

10

At the hearing, Plaintiff and a vocational expert testified.[57] Plaintiff was represented by an attorney who, in addition to the ALJ, conducted an examination of Plaintiff and the vocational expert.[58]

Plaintiff testified that, prior to the alleged disability period, she was involved in several automobile accidents, including the 2015 accident that precipitated her resignation from Ben Taub Hospital.[59]  Regarding treatment, Plaintiff initially stated she received medication and physical therapy for approximately one year.[60]  Plaintiff later stated that she took 400 milligrams of Ibuprofen three times per day for six months, had an MRI scan done, and received physical therapy three days per week for six months.[61] She also reported receiving epidural steroid injections in her back in 2014.[62]  However, the ALJ found little evidence of physical therapy in the medical record.[63]  Plaintiff then stated that in 2015 she was involved in a minor accident that required no hospitalization or treatment.[64]

---

[57]    See Tr. 43-92.

[58]    See Tr. 75-85

[59]    See Tr. 46-47, 67-69.

[60]    See id.

[61]    See Tr. 59, 62-64.

[62]    See Tr. 65.

[63]    See Tr. 66.

[64]    See Tr. 67-69.

11

Plaintiff reported back problems as a result of the accidents-
-three damaged discs in her back, and two in her neck.[65]  She also
stated she had been following a prescription to take 400 milligrams
of Ibuprofen three times per day for about one month.[66]  During the
hearing, Plaintiff reported experiencing pain at a level of six out
of ten.[67]  She also reported experiencing contemporaneous pain in
her neck, which radiated down to her legs and hands, and numbness
and shaking in her hands.[68] She reported however that she could walk
about seventy-five feet with the assistance of a cane and that
walking farther would cause her legs to give out.[69]  Additionally,
she reported being able to lift about ten pounds and to stand and
sit for ten to fifteen minutes at a time before needing a break.[70]

Regarding her mental health, Plaintiff testified that in 2000,
prior to the alleged disability period, she was diagnosed and
treated for schizophrenia, bipolar disorder, and panic attacks.[71]
She was hospitalized overnight in 2000, but did not receive
treatment again until 2013.[72]  After 2013, she had not received

---

[65]    See Tr. 58.

[66]    See Tr. 60-61.

[67]    See Tr. 76-77.

[68]    See Tr. 78-79.

[69]    See Tr. 77-78.

[70]    See Tr. 80.

[71]    See Tr. 55.

[72]    See id.

additional mental health treatment, but had an appointment scheduled about a week after the hearing with the ALJ.[73]  Plaintiff testified that she was seeking treatment again at the recommendation of her physician because she was forgetful, had difficulty concentrating, and had trouble communicating with others.[74]  She also testified that she had panic attacks once or twice per week when worried.[75]

The ALJ also examined Herman Litt ("Litt"), a vocational expert, to evaluate Plaintiff's past work history and her capability to perform that work or any other job in the national economy.[76]  Regarding work history, Plaintiff testified that from 2006-2007, she worked at Texas A&M University doing custodial and food service work.[77]  While there, her job was to prepare meals in a kitchen and serve food on the line.[78]  Plaintiff also testified that from 2010-2011, she worked at Memorial Hermann as a dietician delivering meals to patients.[79]  For 2013-2014, Litt testified, Plaintiff worked as a dietary aide (medium exertional level,

---

[73]  See Tr. 55-56.

[74]  See Tr. 82-83.

[75]  See id.

[76]  See Tr. 85-92.

[77]  See Tr. 85-86.

[78]  See id.

[79]  See Tr. 87.

unskilled) and a cleaner (light exertional level, unskilled).[80]

The ALJ then asked Litt what work occupations Plaintiff would be able to maintain if she were placed at the medium exertional level with the following restrictions:

> fifty pounds occasionally, twenty frequently; sit/stand/walk . . . six of eight for a full eight hour[s]; push/pull, gross/fine is unlimited; occasional stairs, no ladders, ropes, scaffolds, or running. She can occasionally bend, stoop, crouch, crawl, balance, twist, and squat; occasional exposure to heights, dangerous machinery, uneven surfaces. She has the ability to get along with others. She can understand simple instruction[s]; concentrate and perform simple tasks and respond and adapt to workplace changes and supervision.[81]

Litt answered that Plaintiff would be able to perform all of her prior work.[82] If ALJ placed her at the light level and limited her to just occasional public/employee contact, Litt stated Plaintiff would still be able to work as a cleaner.[83] However, if Plaintiff were found unable to perform any posturals (i.e., no bending, crouching, stooping, or crawling), she would not be able to work as a cleaner.[84] If she needed a fifteen-minute break for every hour of work, she would be unable to sustain the cleaner job, or any job, in the national economy.[85]

---

[80]   See Tr. 87-88.

[81]   See Tr. 88-89.

[82]   See id.

[83]   See id.

[84]   See Tr. 90-91.

[85]   See id.

## D.  <u>Commissioner's Decision</u>

On August 28, 2016, the ALJ issued an unfavorable decision.[86] The ALJ found that Plaintiff had not engaged in substantial gainful activity since February 9, 2015, the alleged disability onset date.[87]  The ALJ recognized the following impairments as "severe:" "cervicalgia and lumbagia with radiculopathy and depression."[88]  He found Plaintiff's asthma and hypertension were "not severe" because they were being controlled with medication.[89]

At the Listing step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.[90]  Regarding Plaintiff's spinal injuries, the ALJ found Plaintiff's cervicalgia and lumbagia with radiculopathy failed to meet the Listing 1.04 criteria because there was no compromise of a nerve root or the spinal cord along with various additional requirements.[91]  Regarding her mental impairments, the ALJ found Plaintiff had a mild restriction in her ability to understand, remember, or apply information; moderate difficulties in interacting with others;

---

[86]   <u>See</u> <u>Tr.</u> 23-35.

[87]   <u>See</u> <u>Tr.</u> 26.

[88]   <u>See</u> <u>id.</u>

[89]   <u>See</u> <u>id.</u>

[90]   <u>See</u> <u>id.</u>

[91]   <u>See</u> <u>id.</u>

15

moderate difficulties in her ability to concentrate, persist, or maintain pace; no difficulties in ability to adapt or manage herself.[92]   Based on these findings, the ALJ concluded that the Plaintiff had not satisfied the listed criteria.[93]

The ALJ then discussed Plaintiff's residual functional capacity ("RFC") and found that she had the ability to perform light work with the following restrictions:

> lifting a maximum of twenty pounds and frequently ten pounds. She can sit, stand and walk six of eight hours each for a full eight-hour day.  Her push/pull and gross/fine dexterity is unlimited.  She can occasionally bend, stoop, crouch, crawl, balance, twist and squat. She requires [sic] occasional exposure to heights, dangerous machinery, and uneven surfaces.  She gets along with others, understands simple instructions, concentrates and performs simple tasks, and responds and adapts to workplace changes and supervision, but in an occasional public/employee contact setting.[94]

The ALJ did not find Plaintiff's allegations of frequent falls, asthma, hypertension, and mental health impairments persuasive because she was already on medication for asthma and hypertension, and had not received mental health treatment since 2013.[95]  He also speculated that Plaintiff scheduled the mental health appointment as a way to "impress the court," and gave some weight to the consultative mental examination of July 2015 (conducted by Dr.

---

[92]     See Tr. 27.

[93]     See Tr. 27-28.

[94]     See Tr. 28.

[95]     See Tr. 29.

Huckleberry) which found Plaintiff capable of simple tasks and instructions with occasional public/employee contact.[96]  However, he found this limitation to be a result of her lack of education and cognitive ability rather than due to alleged mental health impairments for which she was taking no medication.[97]

The ALJ then discussed Plaintiff's lumbar and cervical impairments with chronic neck and back pain.[98]  He stated that the medical record revealed little treatment since Plaintiff only took "off-the-shelf" ibuprofen, and stopped taking pain medication in 2014 until a month before the hearing.[99]  He similarly found "no objective record [evidence]" to support Plaintiff's claim of previous physical therapy or the prescribed use of a cane.[100]  He thus gave little weight to Plaintiff's need for an assistive device and found her musculoskeletal impairments to be not limiting and not precluding a limited, light level of exertional activity.[101]

The ALJ discussed Plaintiff's testimony regarding the extent of the limiting effect of her impairments and found her testimony to be not entirely consistent as she stated that she "[did] not do anything" but was able to manage her finances, handle light chores,

---

[96]     See id.

[97]     See id.

[98]     See id.

[99]     See id.

[100]    See id.

[101]    See id.

and navigate public transportation.[102]   He also noted that Plaintiff's lack of compliance with taking prescribed medication suggested that the symptoms may not be as limiting as Plaintiff stated.[103]   Finally, he concluded that  Plaintiff's statements regarding intensity, persistence, and limiting effects of her symptoms only affected her ability to work "to the extent that they can reasonably be accepted as consistent with the objective medical and other evidence."[104]

The ALJ then discussed the results of several of Plaintiff's visits to a hospital or doctor to support his conclusion that the medical evidence did not support the severity of Plaintiff's alleged loss of functioning.[105]  He noted that there was no evidence that Plaintiff complied with Dr. Lee's recommendation for epidural steroid injections and physical therapy in July 2015.[106] Additionally, the ALJ gave moderate weight to Dr. Huckleberry's assessment as it was only partly consistent with the medical evidence and appeared to rely on Plaintiff's self-reported symptoms rather than Dr. Huckleberry's own examination.[107]  Great weight was given to Dr. Daniel's assessment, as it was consistent with the

---

[102]     See Tr. 30.

[103]     See id.

[104]     See id.

[105]     See Tr. 31-34.

[106]     See Tr. 31.

[107]     See Tr. 31-32.

18

medical evidence.[108]

The ALJ also gave great weight to the vocational expert's testimony and found Plaintiff capable of performing her past relevant work as a cleaner.[109]  He gave little weight to Plaintiff's representations of being unable to perform posturals, needing a fifteen-minute break every hour, and needing to be absent for at least two days per month as unsupported by the objective medical record.[110]  Based on the medical record and the gaps in treatment, the ALJ found little evidence of Plaintiff's impairments worsening and little evidence of longitudinal treatment.[111]  He thus found Plaintiff had not been under a disability from the alleged onset date through the date of his decision.[112]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: (1) substantial evidence in the record supports the decision; and (2) the ALJ applied proper legal standards in evaluating the record.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

---

[108]    See Tr. 32.

[109]    See Tr. 34.

[110]    See id.

[111]    See Tr. 35.

[112]    See id.

## A.  **Substantial Evidence**

Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks omitted).  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."  Id.  It only requires "more than a scintilla."  Id.

The Commissioner has the responsibility of resolving any conflict in the evidence.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  See Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  Id.

**B.  <u>Legal Standard</u>**

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(a); <u>see also</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are;
>
> (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;"
>
> (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors;
>
> (4) a claimant who is capable of performing work that [s]he

has done in the past must be found "not disabled;" and

(5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. §§ 404.1520, 416.920.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled.  Greenspan, 38 F.3d at 236.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that: (1) the ALJ improperly determined that Plaintiff's back impairment did not meet or equal the requirements of Listing 1.04; (2) the ALJ improperly determined Plaintiff's RFC; and (3) the ALJ "supplant[ed] his lay opinion in lieu of contrasting medical evidence, consistently mischaracterize[d] the record, and ma[de] inappropriate and false accusations of Plaintiff and Plaintiff's counsel."  Defendant argues that the ALJ's decision is supported by substantial evidence and is legally sound.

### A.  Listing 1.04 - Disorders of the Spine

The Listings "describe for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of her . . . age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  If the requirements of any Listing are

met or equaled by an individual's impairment, the individual is presumptively deemed disabled. <u>Whitehead v. Colvin</u>, 820 F.3d 776, 780-81 (5th Cir. 2016); <u>see also</u> 20 C.F.R. §§ 404.1525, 416.925. Plaintiff bears the burden of showing that her impairment meets all of the specified medical criteria. <u>Id.</u> at 781 (quoting <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990)). Listing 1.04 concerns disorders of the spine and, at the time of the ALJ's decision, stated:

> 1.04  Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
> or
>
> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Plaintiff's argument focuses on the requirements set out in Section A and the MRI of the cervical and lumbar spine.  While

there is evidence of spinal stenosis in the record, there is not evidence of nerve root compression.   The record noted mild "contact" between the left central annular fissure and the L5 nerve roots—not nerve root compression.   The record also stated the conus medullaris and nerve roots were "normal."

Additionally, while there was residual weakness of arm strength and reflex in July 2015, the December 2015 exam found all systems to be normal, and no evidence of muscle atrophy.   The tendon reflexes were also "grossly normal" and strength was, at its lowest rating, four out of five.   While there appeared to be an inconsistency between these two assessments, the ALJ resolved it, as was his responsibility, by giving great weight to the December 2015 assessment as consistent with the medical record.   Finally, it appears that, between the two visits, Plaintiff's physical condition improved despite a lack of evidence of compliance with Dr. Lee's recommendation in July 2015.

Plaintiff's contentions that her impairments meet or equal a Listing are not wholly supported by the record, and conflicts in the record were not resolved in her favor.   Therefore, the ALJ's decision regarding this point is supported by substantial evidence.

## B.   <u>Residual Functional Capacity</u>

The Plaintiff's RFC is her utmost remaining ability to work despite all of the limitations resulting from each of her impairments. <u>See</u> <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1023 (5th Cir.

1990); 20 C.F.R. §§ 404.1545(a)(1), 416.945(b)-(e).  In evaluating the claimant's RFC, the ALJ is directed by the regulations to consider how the Plaintiff's impairment affects her physical, mental, and other abilities, as well as the total limiting effects of her impairment.  See 20 C.F.R. § 404.1545(b)-(e).  The mere mention of a condition in the medical record does not establish a disabling impairment or even a significant impact on that individual's functional capacity.  Cf. Johnson v. Sullivan, 894 F.2d 683, 685 (5th Cir. 1990) (referring to a diagnosis as only part of the evidence that must be considered).  The regulations provide that the ultimate responsibility for determining RFC lies with the ALJ.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also Taylor v. Astrue, 706 F.3d 600, 602-03 (5th Cir. 2012).

Plaintiff first argues that the ALJ erred in finding that Plaintiff could perform light and sedentary work.  Plaintiff references testimony and evidence of several physical and mental impairments, including degenerative disc disease, nerve root impingement, insomnia, and schizophrenia.  However, Plaintiff does not cite, perhaps because they do not exist, specific medical records to explain how these impairments affect or limit her RFC more severely than the ALJ recognized.  Instead, Plaintiff provides only the conclusory statement that she "cannot engage in any exertional activities due to the effects of her impairments."  However, because the ALJ considered and weighed all of the

evidence, and Plaintiff has failed to identify specific records in support of her assertion, the ALJ did not err in his RFC determination, and it is supported by substantial evidence.

Additionally, Plaintiff argues the ALJ should have considered the amount of time she would be absent from employment due to pain, fatigue, medical treatment, and recovery. Plaintiff cites <u>Watson v. Barnhart</u>, 288 F.3d 212, 217 (5th Cir. 2002), in support of the proposition that a claimant must be able to find employment and maintain it for a "significant period of time."[113]  While Plaintiff is correct, she failed to provide any medical evidence suggesting she would need to be absent for extended periods of time and would thus be unable to maintain employment for a significant period of time.  In fact, there is practically no evidence that Plaintiff's mental health impairments would affect work attendance, and much of the record regarding her physical impairments recommended that those impairments be addressed with medication, epidural steroid injections, and physical therapy.  While these treatments could affect work attendance, Plaintiff has not complied with these recommendations and has not shown that they will prevent her from maintaining employment.  Therefore, the court rejects this argument.

Plaintiff also argues that the ALJ failed to provide a function-by-function assessment of the effect her severe

---

[113]    Doc. 13, Pl.'s Mot. for Summ. J. p. 8.

impairments affect her residual functional capacity.

The ALJ is required to perform a function-by-function assessment of Plaintiff's ability to do "sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Myers v. Apfel, 238 F.3d 617, 619 (5th Cir. 2001). The function-by-function assessment for physical activities involves seven strength demands: (1) sitting; (2) standing; (3) walking; (4) lifting; (5) carrying; (6) pushing; and (7) pulling. Id. The function-by-function assessment for mental abilities involves evaluating the following: (1) "limitations in understanding, remembering, and carrying out instructions;" and (2) "responding appropriately to supervision, co-workers, and work pressures in a work setting." See 20 C.F.R. §§ 404.1545(c), 416.945(c).

In this case the first paragraph of the ALJ's RFC determination, explicitly and in boldface font, listed his function-by-function assessment of Plaintiff's physical and mental capabilities. He stated that with her RFC, she could perform the following:

> lifting a maximum of twenty pounds and frequently ten pounds. She can sit, stand and walk six of eight hours each for a full eight-hour day. Her push/pull and gross/fine dexterity is unlimited. She can occasionally bend, stoop, crouch, crawl, balance, twist and squat. She requires occasional exposure to heights, dangerous machinery, and uneven surfaces. She gets along with others, understands simple instructions, concentrates and performs simple tasks, and responds and adapts to workplace changes and supervision, but in an occasional

public/employee contact setting.

Therefore, the ALJ did not fail to perform a function-by-function assessment.

Finally, Plaintiff argues that her conditions "require constant supervision and treatment" and thus would prevent her from holding any position for a significant period of time.  However, once again, Plaintiff cites no specific medical evidence to support this proposition and states only that it is supported by "ample record evidence."  On the contrary, the record evidence, or lack thereof, regarding mental health impairments and Plaintiff's lack of compliance with various recommendations (e.g., epidural steroid injections and physical therapy) illustrate that her conditions in fact do not require constant supervision and treatment.  If Plaintiff's assertions were true, she would have ample support in her medical records.  Thus, the court rejects this argument.

As Plaintiff generally lacks evidence in support of her contentions, the ALJ's findings regarding Plaintiff's RFC are supported by substantial evidence.

## C.   **Other Arguments**

Plaintiff's final argument is that "The ALJ supplant[ed] his lay opinion in lieu of contrasting medical evidence, consistently mischaracterize[d] the record, and ma[de] inappropriate and false accusations of Plaintiff and Plaintiff's counsel."  The court interprets this statement, and its supporting evidence/arguments,

to actually raise several other claims, as explained below.

**1.   ALJ's Failure to Give Proper Weight to Medical Evidence**

Plaintiff argues that the ALJ found little evidence to support her allegations of mental health impairments despite the evidence in the record.   Plaintiff first mistakenly cites to "Exhibit 12F11,"[114] records from Interventional Spine of Texas, to support the assertion that there were formal diagnoses of schizophrenia and bipolar disorder in the record.   However, a brief review of the exhibit reveals that it concerned Plaintiff's physical and spinal impairments and made no mention  of schizophrenia and bipolar disorder.

Next, the Plaintiff points to the "severe" problems and "host of concerns" found by Dr. Huckleberry in her consultative mental status examination of Plaintiff.   The court interprets this argument to be that the ALJ failed to give proper weight to the consultative mental status exam.

The ALJ must evaluate every medical opinion in the record and decide what weight to give each.   20 C.F.R. §§ 404.1527(c), 416.927(c).   The ALJ is also required to give good reasons for the weight given a treating source's opinion.   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).   The ALJ may consider factors like consistency of the opinion with the record as a whole, the supportability of the opinion, and the length and extent of the

---

[114]     See Tr. 539.

treatment relationship.  20 C.F.R. §§ 404.1527(c), 416.927(c).

Here the ALJ gave weight to the opinions in the record and decided that moderate weight was due to Dr. Huckleberry's mental status examination.  He explained the reason for this weight was that Dr. Huckleberry's assessment was only partly consistent with the medical evidence and that she appeared to rely on Plaintiff's self-reported symptoms rather than her own examination.  The court finds the ALJ's reasons to be sufficient and rejects Plaintiff's argument.

## 2.  ALJ's Failure to Develop the Record

Plaintiff argues the ALJ should have, but failed to, obtain a treating or consulting source statement regarding the impact of her mental impairments on her ability to work.

The law does not require the government, at its expense, to conduct a consultative examination "unless the record establishes that such an examination is necessary to enable the [ALJ] to make the disability decision." Anderson v. Sullivan, 887 F.2d 630, 634 (5th Cir. 1989) (citing Jones v. Bowen, 829 F.2d 524, 526 (5th Cir. 1987)).  A consultative examination "becomes 'necessary' only when the [Plaintiff] presents evidence sufficient to raise a suspicion concerning a non-exertional impairment." Brock v. Chater, 84 F.3d 726, 728 (5th Cir. 1996) (citing Jones, 829 F.2d at 526).  The ALJ has discretion to decide whether to order a psychological exam. Anderson, 887 F.2d at 634 (citing Jones, 829 F.2d at 526).

30

However, if the ALJ fails to fully and fairly develop the record, then his decision is not substantially justified.  Ripley v. Chater, 67 F.3d 552, 557 (5th Cir. 1995).  Reversal is appropriate only when the plaintiff shows that she was prejudiced. Id.  To establish prejudice, she must show that further development of the record "could and would have adduced evidence that might have altered the result."  Carey v. Apfel, 230 F.3d 131, 142 (5th Cir. 2000).

In this case, at the time of the ALJ's decision, the record already contained two consultative exams, one physical and one mental, as well as other records regarding Plaintiff's physical impairments.  The ALJ determined that he was able to reach a decision based on the already developed record and thus exercised his discretion in choosing not to order yet another psychological examination.  Finally, Plaintiff has not shown that she was prejudiced by the ALJ's decision not to order a second psychological examination.  Because the record was fully and fairly developed and Plaintiff raised no contention of prejudice, the ALJ's decision is supported by substantial evidence and no additional treating or consulting source is required.

### 3.  ALJ's Lay Opinion in Lieu of the Medical Record

Plaintiff argues the ALJ substituted his lay opinion for that of a medical expert and cites to Williams v. Richardson in support. However, in that case involving "complex physiological issues," the

31

Fifth Circuit merely "disapprove[d]" of the examiner's reliance on his "own interpretation of medical texts" rather than the opinion of experts.  Williams v. Richardson, 458 F.2d 991 (5ᵗʰ Cir. 1972). After reviewing the ALJ's decision, the court does not find that the ALJ, in any instance, based his decision on his own interpretation of the medical evidence or texts.

**4.  ALJ's Prejudice/Bias and Unsuitability to Serve**

Plaintiff's remaining arguments appear to be attacks on the ALJ's character and suitability to his office rather than substantive legal arguments.  The court interprets these arguments to be, at least in part, allegations of prejudice or bias toward Plaintiff.

"[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge" unless "they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." Brown v. Appel, 192 F.3d 492 (5ᵗʰ Cir. 1999) (quoting Liteky v. United States, 510 U.S. 540, 555 (1994)) (applying standards for federal judges to an ALJ).  Opinions formed by the judge based on facts introduced or events occurring in the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a "deep-seated favoritism or antagonism that would make fair judgment impossible."  Liteky v.

<u>United States</u>, 510 U.S. 540, 555 (1994).  Thus, the bar to prevail on a judicial bias claim is set high.

Plaintiff first states the ALJ found Plaintiff's limitations in public/employee contact to relate mostly to her lack of education and general cognitive ability rather than her mental impairments.  Plaintiff argues that this finding is evidence of his prejudice toward her and the poorly educated and that it implies causation between education level and cognitive ability.  Plaintiff complains that the ALJ's accusation toward Plaintiff and counsel of "doctor shopping" and ALJ's other "despicable and shockingly horrible behavior" make him unfit for his position.  Plaintiff also cites to the "hearing audio generally" in support of her claim that the ALJ's direct examination was "actually closer to a criminal cross examination, or even a school yard bully" and that Plaintiff's testimony was "clearly taken under duress."

Plaintiff's colorful arguments, to be frank, are nonsense and an inefficient use of the court's time and resources.  The ALJ's finding that Plaintiff's limitations in public/employee contact were a result of her lack of education and cognitive ability did not imply a relation between education level and cognitive ability.  Plaintiff clearly misconstrues the ALJ's statement on this point.  Additionally, after review of the written hearing transcript[115] the court finds no inappropriate or even questionable remarks made by

---

[115]    Plaintiff did not submit the hearing audio recording into the record.

33

the ALJ.  Finally, none of the alleged "despicable and shockingly horrible" incidents display "deep-seated favoritism" and, to the extent that they apply to Plaintiff, are opinions based on the facts of the current or prior proceedings.  Clearly, Plaintiff and counsel are more than merely dissatisfied with the ALJ's handling of this and other hearings.  However, a judicial proceeding is not the appropriate venue to air complaints regarding an ALJ's suitability to serve.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 5th day of June, 2019.

34

Nancy K. Johnson
United States Magistrate Judge